1

2

3

4

5

6                        UNITED STATES DISTRICT COURT

7                              DISTRICT OF NEVADA

8                                  * * * * *

9    TINA SMITH, an individual; and as the       )
     guardian for CHANAE SMITH, a minor:  and )
10   OMAR SMITH, a minor, by and through their )      03:05-CV-0176-LRH-LRL
     mother, TINA SMITH,                         )
11                                               )
                    Plaintiffs,                  )
12                                               )        O R D E R
     vs.                                         )
13                                               )
     GARY UNDERHILL, in his official and         )
14   individual capacity; MIKE MIERAS, in his    )
     official and individual capacity; TOM       )
15   KALLAY, in his official and individual      )
     capacity; DAVID SAYER, in his official and )
16   individual capacity; WASHOE COUNTY          )
     SCHOOL DISTRICT; and DOES 1 through         )
17   10,                                          )
                                                 )
18                  Defendants.                  )
                                                 )
19   _____)

20          Presently before this court is Defendants' Motion to Dismiss (#21)[1].  Plaintiffs have

21   submitted an opposition (#23), to which Defendants subsequently replied (#27).  Additionally,

22   Plaintiffs have requested the court take judicial notice of the fact that the Washoe County School

23   District receives federal funding (#23).

24                       **FACTUAL AND PROCEDURAL BACKGROUND**

25          This case arises out of an alleged discriminatory detention and arrest of an African-

26   American female student at Hug High School ("HHS"), a school within the Washoe County

27   School District ("WCSD").  According to Plaintiffs Tina Smith, Chanae Smith and Omar Smith

28
     _____
             [1]  All references to (#XX) refer to the court's docket.

1    (hereafter "Tina," "Chanae," "Omar," or "Plaintiffs"), a fight arose on the HHS campus on

2    October 7, 2004.  Defendant Gary Underhill (hereafter "Underhill"), a HHS campus security

3    officer, arrested Chanae and other students.  Chanae claims to have simply been walking past the

4    fight when it was broken up, that at least one student had told Underhill that Chanae was not

5    involved in the fight, and that Underhill arrested Chanae merely because she was a known

6    troublemaker.  Chanae was transported to Juvenile Hall before being released to her mother,

7    Tina.

8          Omar was preparing to become a student at HHS.  On November 16, 2004, Omar, Tina,

9    and Ashley Ball[2], a Sparks High School student, were on the HHS campus to complete pre-

10   registration activities for Omar.  Underhill noticed Ashley Ball, who had been left unattended in

11   Tina's car, and approached her.  Underhill told Ashley Ball she was trespassing and that she

12   would receive a citation rather than be arrested.  Underhill also commented to Omar that Omar

13   would get to know Underhill's face.  When Tina arrived back at the car she insisted Underhill

14   leave the children alone.  Underhill ticketed Tina for not having her car registered properly.

15         On November 23, 2004, Tina and Omar were on campus to get Omar's picture taken for

16   his student identification.  Underhill detained Omar and asked for his identification.  When Omar

17   was unable to produce the identification he was told he could be arrested.  Tina told Omar he did

18   not need to produce identification for Underhill and told Underhill to leave them alone.

19   Allegedly, Underhill responded by yelling at Tina and telling her she could not tell him what to

20   do.  Tina states that Defendant David Sayer (hereafter "Sayer"), HHS's vice principal, was

21   present at the encounter but simply walked past.

22         Tina contends that she has filed discrimination complaints with HHS principal Tom

23   Kallay (hereafter "Kallay") regarding her, and her children's, treatment by Underhill, but that no

24   action has been taken on those complaints.

25   _____

26         [2] Ashley Ball is the plaintiff in case 03:05-CV-0178, one in a series of cases arising out
     of incidents involving Gary Underhill and HHS.  In the resolution of the motion to dismiss in that
27   case the court notes that she is a HHS student.  Her enrollment at HHS predated her involvement
     in the incidents to which she was a party described in this case.
28

1

**LEGAL STANDARD FOR MOTION TO DISMISS**

2  In considering "a motion to dismiss, all well-pleaded allegations of material fact are taken

3  as true and construed in a light most favorable to the non-moving party." *Wyler Summit P'Ship*

4  *v. Turner Broad. Sys., Inc.*, 135 F.3d 658, 661 (9th Cir. 1998) (citation omitted).  However, a

5  court does not necessarily assume the truth of legal conclusions merely because they are cast in

6  the form of factual allegations in plaintiff's complaint. *Clegg v. Cult Awareness Network*, 18

7  F.3d 752, 754-55 (9th Cir. 1994).

8  There is a strong presumption against dismissing an action for failure to state a claim.

9  *Gilligan v. Jamco Dev. Corp.*, 108 F.3d 246, 249 (9th Cir. 1997) (citation omitted).  "The issue is

10  not whether a plaintiff will ultimately prevail but whether [he or she] is entitled to offer evidence

11  in support of the claims." *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974), *overruled on other*

12  *grounds by Harlow v. Fitzgerald*, 457 U.S. 800, 807 (1982).  Consequently, the court should not

13  grant a motion to dismiss "for failure to state a claim unless it appears beyond doubt that the

14  plaintiff can prove no set of facts in support of his claim which would entitle him to relief."

15  *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *see also Hicks v. Small*, 69 F.3d 967, 969 (9th Cir.

16  1995).

17

**DISCUSSION**

18  Plaintiffs filed the present complaint alleging eleven claims for relief:  violation of their

19  Fourth and Fourteenth Amendment rights through 42 U.S.C. § 1983; violation of Title VI, 42

20  U.S.C. § 2000d; conspiracy in violation of 42 U.S.C. § 1985; complacency to conspiracy in

21  violation of 42 U.S.C. § 1986; battery; false imprisonment; intentional infliction of emotional

22  distress; negligent infliction of emotional distress; violation of Nevada Revised Statute sections

23  388.132-388.135; negligent supervision and training; and violation of administrative regulations.

24  However, in their opposition to Defendants' motion to dismiss, Plaintiffs have acquiesced in

25  dismissal of their claims arising under section 1985, section 1986 and Nevada Revised Statute

26  sections 388.132-388.135.  Thus, the court will dismiss these claims and will not discuss them

27  further in this order.

28  ///

### A.   FEDERAL CLAIMS

Through the briefing of the motion to dismiss, the court has been notified of refinements to the federal claims brought in this matter.  Specifically, the Title VI claim is brought only by Chanae and Omar, and only against the WCSD because individual defendants cannot be sued under Title VI.  Further, the request for punitive damages under Title VI has been dropped as Title VI does not allow for such an award.  The section 1983 claim, however, is brought by all plaintiffs and is against all defendants.

#### 1.   *Title VI of the Civil Rights Act of 1964 Claim*

Title VI provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  42 U.S.C. § 2000d.  To properly plead a cause of action, a plaintiff must allege both that the defendant is an entity engaging in racial discrimination and that it is receiving federal funding.  *Fobbs v. Holy Cross Health System Corp.*, 29 F.3d 1439, 1447 (9th Cir. 1994), *overruled in part on other grounds by Daviton v. Columbia/HCA Healthcare Corp.*, 241 F.3d 1131 (9th Cir. 2001).

Defendants argue that this claim must be dismissed due to Plaintiffs' failure to allege that WCSD is a recipient of federal funds.  Plaintiffs have responded by requesting this court to take judicial notice of the fact that the WCSD is a federally funded entity.  This court may take judicial notice of facts that are generally known within the court's jurisdiction or capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.  Fed. R. Evid. 201(b).  The court concludes that it is beyond reasonable dispute that the WCSD is a federally funded entity.  Such information is clearly that type which is generally known within the territorial jurisdiction.  Accordingly, the court will take judicial notice of the fact that the WCSD is a federally funded entity.

#### 2.   *Section 1983 Claim*s

Section 1983 claims have been brought by Tina, Chanae and Omar against all defendants and allege violations of their Fourth and Fourteenth Amendment rights.  Defendants argue that the claims raised by Plaintiffs are subsumed by their second claim for relief, seeking

4

1    compensation for violation of Title VI.  In the alternative, Defendants argue that any claims not

2    subsumed are barred as to the individual defendants under the doctrine of qualified immunity.

3         The court notes that the refinements made in the pleadings show that Tina is not bringing

4    a Title VI claim, as she is not a proper plaintiff.  Thus, at the outset, the court can conclude that

5    Tina's section 1983 claim is not subsumed by any Title VI claims.  Additionally, the court is

6    cognizant of Defendants' arguments made pursuant to *Heck v. Humphrey*, 512 U.S. 477, 486-87

7    (1994).  Specifically, Defendants argue that a favorable judgment on Chanae's section 1983

8    claim would imply that any juvenile proceedings against her are invalid.  Therefore, Defendants

9    argue that *Heck*'s protections against such collateral attacks are a bar to one or more of Chanae's

10   section 1983 claims.  At this stage of the proceedings, the facts relative to a *Heck* argument are

11   not clearly before the court.  For this reason, the court will reserve ruling on this issue at this

12   time.

13        a.    Subsuming Analysis

14        Chanae and Omar have brought two section 1983 claims in the present lawsuit.  The first

15   is a claim for violation of their equal protection rights, the second a claim for violation of their

16   due process rights.  Defendants have moved to dismiss both section 1983 claims, arguing they

17   are subsumed by Chanae and Omar's Title VI claim because the conduct giving rise to the claim

18   arises out of the same facts as the Title VI claim.

19        42 U.S.C. § 1983 supplies a cause of action to a plaintiff when a person acting under the

20   color of law deprives that plaintiff of any "rights, privileges, or immunities secured by the

21   Constitution and laws [of the United States.]"  However, "[w]hen the remedial devices provided

22   in a particular Act are sufficiently comprehensive, they may suffice to demonstrate congressional

23   intent to preclude the remedy of suits under § 1983."  *Middlesex County Sewerage Auth. v. Nat'l

24   Sea Clammers Ass'n*, 453 U.S. 1, 20 (1981).  In determining whether an act subsumes a section

25   1983 action, the court must determine whether Congress intended that act to supplant any remedy

26   that would otherwise be available under section 1983.  *Id*. at 21.  Such Congressional intent may

27   be found directly in the statute creating the right or inferred when the statutory scheme is

28   incompatible with individual enforcement under section 1983.  *City of Rancho Palos Verdes,*

1   *Cal. v. Abrams*, 125 S.Ct. 1453, 1458 (2005).  The defendant bears the burden of demonstrating

2   that Congress has expressly withdrawn the section 1983 remedy.  *Golden State Transit Corp. v*

3   *City of Los Angeles*, 493 U.S. 103, 107 (1989).

4         The Ninth Circuit has not decided the specific issue of whether section 1983 is subsumed

5   by Title VI.  However, the Ninth Circuit has recognized the Supreme Court's *Sea Clammers*

6   doctrine when construing other federal statutes and found that those statutes precluded a section

7   1983 remedy.  *See, e.g.*, *Dittman v. California*, 191 F.3d 1020 (9th Cir. 1999); *Dep't of Educ.,*

8   *State of Hawaii v. Katherine D.*, 727 F.2d 809 (9th Cir. 1984).  In addition, the District of

9   Nevada has recognized that a section 1983 action is barred in the context of Title IX of the

10  Education Amendments Act of 1972, 20 U.S.C. § 1681 *et seq*.  *Henkle v. Gregory,* 150

11  F.Supp.2d 1067 (D. Nev. 2001).

12        In the present case, this court is called upon to decide whether Title VI serves to bar an

13  action brought pursuant to section 1983.  While Title VI does not explicitly purport to limit

14  section 1983 relief, 42 U.S.C. § 2000d, congressional intent to foreclose such a remedy can still

15  be inferred from the creation of a comprehensive statutory scheme.  *Sea Clammers*, 453 U.S. at

16  20.   Therefore, the first question this court must decide is whether Title VI is sufficiently

17  comprehensive to demonstrate the congressional intent to foreclose a section 1983 remedy.  If

18  Title VI is sufficiently comprehensive, the court must determine whether Plaintiffs' section 1983

19  claims seek to remedy conduct that is within the scope of Title VI.  Only section 1983 claims that

20  are within the scope of a comprehensive statutory scheme are subsumed by that scheme.  *See*

21  *Smith v. Robinson*, 468 U.S. 992, 1003 n.7 (1984) *superseded by* Education of the Handicapped

22  Act*, § 615(e)(4), as amended, 20 U.S.C. § 1415(e)(4).

23        The courts are split as to whether Title VI subsumes section 1983.  The Seventh Circuit[3]

24  and the Western District of New York[4] have found that Title VI is sufficiently comprehensive to

25  preclude a plaintiff from bypassing its enforcement mechanisms through a section 1983 action.

26        ———————————

27        [3]*Boulahanis v. Bd. of Regents*, 198 F.3d 633, 641 (7th Cir. 1999).

28        [4]*Bayon v. State Univ. of New York at Buffalo*, 2001 WL 135817, *3 (W.D.N.Y. 2001).

1    Conversely, The Third Circuit[5] and the First Circuit[6] have found that Title VI is not sufficiently

2    comprehensive.  After examining the relevant case law and the statutory scheme of Title VI, this

3    court finds that Title VI is sufficiently comprehensive to evince congressional intent to foreclose

4    a section 1983 remedy.

5          As mentioned previously, this district has found that Title IX is sufficiently

6    comprehensive to foreclose a section 1983 remedy.  *Henkle*, 150 F.Supp.2d at 1074.  Title IX

7    was patterned after Title VI and is enforced and interpreted in the same manner as Title VI.

8    *Barnes v. Gorman*, 536 U.S. 181, 185 (2002) (citations omitted); *Alexander v. Sandoval*, 532

9    U.S. 275, 280 (2001) (citations omitted).  As with Title IX, the court finds that Title VI contains

10   a comprehensive administrative enforcement scheme.[7]  *See* 34 C.F.R. § 100.1 *et seq.*; *Henkle*,

11   150 F.Supp.2d at 1073.

12         Title VI's administrative scheme allows persons who believe they were discriminated

13   against to file a written complaint with the responsible department official.  34 C.F.R. § 100.7(b).

14   A complaint that indicates noncompliance with Title VI triggers a prompt investigation.  34

15   C.F.R. § 100.7(c).  If the investigation reveals a failure to comply with Title VI, the department

16   will take steps necessary to ensure compliance.  34 C.F.R. §§ 100.7, 100.8, 100.9.  Although

17   these regulations do not provide a monetary remedy for a complainant who was discriminated

18   against, the regulations do provide a process designed to effectuate compliance with Title VI.  A

19   federally funded entity that does not comply with Title VI may ultimately lose its federal

20   financial assistance.  34 C.F.R. § 100.8.  In addition to the administrative remedies, Title VI

21   contains an implied private cause of action through which individuals can obtain both injunctive

22   relief and damages.  *Sandoval*, 532 U.S. at 279.

23

24         [5]*Powell v. Ridge*, 189 F.3d 387, 402 (3rd Cir. 1999) *overruled on other grounds by Alexander v.*

25   *Sandoval*, 532 U.S. 275 (2001).

26         [6]*Cousins v. Sec'y of the United States Dep't of Transp.*, 857 F.2d 37, 44-45 (1st Cir. 1988)

27   (indicating that Title VI remedies, sought pursuant to section 505 of the Rehabilitation Act of 1973, are
     not "so comprehensive as to indicate a congressional intent to foreclose alternate avenues of relief").

28         [7]In fact, Title IX relies on many of the provisions applicable to Title VI.  34 C.F.R. § 106.71.

1    An additional consideration in determining whether a particular statutory scheme should

2    bar a section 1983 action, apart from administrative and private remedies, is whether that scheme

3    provides a more restrictive private remedy for statutory violations than would otherwise be

4    available pursuant to section 1983.  *Abrams*, 125 S.Ct. at 1458.  In the context of Title VI, the

5    Supreme Court has recognized that the available remedies should sometimes be limited to

6    declaratory and injunctive relief.  *Guardians Ass'n v. Civil Serv. Comm'n*, 463 U.S. 582, 595-97

7    (1983).  Furthermore, a Title VI plaintiff can only seek recovery from the recipient of the federal

8    funding.  *Shotz v. City of Plantation*, 344 F.3d 1161, 1169-70 (11th Cir. 2003).  In other words,

9    individuals may not be held liable under Title VI.  *Id*.

10   Given the fact that Title VI offers an administrative enforcement scheme, a private right

11   of action and damages that are more restrictive than those available through section 1983, the

12   court finds that a remedy under section 1983 for conduct within the scope of Title VI would be

13   incompatible with Title VI.  *See Abrams*, 125 S.Ct. at 1458.  Title VI provides the exclusive

14   mechanism for recovery to individuals who were discriminated against on the basis of race by

15   any program or activity receiving federal financial assistance.  *See* 42 U.S.C. § 2000d.

16   Although the court has concluded that Title VI subsumes a section 1983 remedy, the

17   inquiry does not end here.  The next question seeks to determine which section 1983 remedies

18   are subsumed by Title VI.  In *Henkle*, the court stated that the plaintiff could not bring a

19   constitutional equal protection claim based upon the same facts as a Title IX claim.  150

20   F.Supp.2d at 1074.  Relying on *Smith*, the *Henkle* court found that "it would be inconsistent to

21   allow a plaintiff to circumvent [the Title IX] scheme by pursuing an equal protection claim under

22   § 1983 based upon the same set of facts." *Id*.  This inconsistency would result from allowing a

23   plaintiff to bypass the scheme Congress created to remedy such violations.  However, this

24   reasoning is inapplicable where a plaintiff brings a cause of action pursuant to section 1983 to

25   redress conduct that is outside the scope of the statutory scheme.  *See Smith*, 468 U.S. at 1003 n.7

26   ("Claims not covered by the EHA should still be cognizable under § 1983, with fees available for

27   such actions.").

28   In the case at bar, Plaintiffs' first cause of action alleges violations of the Fourth

8

1  Amendment and the Equal Protection Clause of the Fourteenth Amendment.  In order to

2  determine whether these claims for relief are subsumed by Title VI, the court must determine

3  whether Title VI proscribes the alleged conduct for which Plaintiffs are seeking relief.  Title VI

4  provides that  "[n]o person in the United States shall, on the ground of race, color, or national

5  origin, be excluded from participation in, be denied the benefits of, or be subjected to

6  discrimination under any program or activity receiving Federal financial assistance."  42 U.S.C. §

7  2000d.

8        Plaintiffs' Equal Protection claim alleges that they were denied the same treatment as

9  other students on account of their race.  The court finds that such allegations fall squarely within

10 the conduct that Title VI was designed to remedy.  Title VI essentially proscribes conduct that

11 would violate the Equal Protection Clause of the Fourteenth Amendment.  *Regents of Univ. of*

12 *California v. Bakke*, 438 U.S. 265, 287 (1978) ("Title VI must be held to proscribe only those

13 racial classifications that would violate the Equal Protection Clause of the Fifth Amendment.").

14 However, as previously discussed, the remedies available under Title VI are different than those

15 that would otherwise be available pursuant to section 1983.  Because Congress enacted a

16 statutory scheme sufficiently comprehensive to remedy racial discrimination committed by an

17 entity receiving federal financial assistance, Plaintiffs cannot pursue a section 1983 remedy for

18 the same conduct.

19        The court, however, reaches a different result with respect to Plaintiffs' Fourth

20 Amendment claims.  Plaintiffs allege that their detentions and arrests were made without

21 probable cause or reasonable suspicion.  The court finds that this claim is not subsumed by Title

22 VI as Title VI was not intended to remedy instances of unreasonable seizures in violation of the

23 Fourth Amendment. Although Plaintiffs allege a discriminatory motive behind their arrests, the

24 cause of action asserts a claim for unreasonable seizure rather than discrimination.

25        b.    Qualified Immunity

26        After the foregoing discussion on whether claims brought under section 1983 are

27 subsumed by Title VI, the court is left with the following section 1983 claims: (1) Tina versus all

28 defendants on both claims; (2) Chanae versus all defendants on the Fourth Amendment claim;

9

1   and (3) Omar versus all defendants on the Fourth Amendment claim.  Defendants argue that the

2   claims against the individual defendants, Underhill, Kallay, Mieras and Sayer, should be

3   dismissed under the doctrine of qualified immunity.

4          State officials are provided with a qualified immunity against section 1983 claims

5   "insofar as their conduct does not violate clearly established statutory or constitutional rights of

6   which a reasonable person would have known."  *Spoklie v. Montana*, 411 F.3d 1051, 1060 (9th

7   Cir. 2005); *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  This immunity is granted broadly

8   and "provides ample protection to all but the plainly incompetent or those who knowingly violate

9   the law."  *Moran v. Washington*, 147 F.3d 839, 844 (9th Cir. 1998) (quoting *Malley v. Briggs*,

10  475 U.S. 335, 341 (1986)).

11         In *Saucier v. Katz*, 533 U.S. 194 (2001), the Supreme Court established a two-step

12  evaluation of qualified immunity, which has also been adopted by the Ninth Circuit.  *See, e.g.*,

13  *Johnson v. County of Los Angeles*, 340 F.3d 787, 791 (9th Cir. 2003); *Jackson v. City of*

14  *Bremerton*, 268 F.3d 646, 651 (9th Cir. 2001).  The first step taken by the court is to make a

15  constitutional inquiry by determining the following issue: "based upon the facts taken in the light

16  most favorable to the party asserting the inquiry, did the officer's conduct violate a constitutional

17  right?"  *Johnson*, 340 F.3d at 791 (citing *Jackson v. City of Bremerton*, 268 F.3d 646, 651 (9th

18  Cir. 2001)); *Saucier*, 533 U.S. at 201.  If the court finds that the officer's conduct violated a

19  constitutional right, the second step of the *Saucier* analysis is that the court determine whether

20  the officer is entitled to qualified immunity.  *Johnson*, 340 F.3d at 791-92.   As part of its

21  qualified immunity analysis, the court should consider whether the law governing the conduct

22  was clearly established when the conduct occurred.  *Robinson v. Solano County*, 278 F.3d 1007,

23  1012 (9th Cir. 2001) (en banc).  If the right violated was clearly established, the court should also

24  decide "whether the officer could nevertheless have reasonably but mistakenly believed that his

25  or her conduct did not violate a clearly established constitutional right."  *Id*. at 201-02; *Saucier*,

26  533 U.S. at 201-05.

27         The first step in the two-step process is intended to "set forth principles which will

28  become the basis for a holding that a right is clearly established."  *Saucier*, 533 U.S. at 201.  If a

10

1  court were to skip this initial step, "[t]he law might be deprived of this explanation," *Id*., thereby

2  inhibiting the development of Fourth Amendment law.  *See Robinson*, 278 F.3d at 1012.  It is

3  therefore necessary to first consider the constitutional inquiry.  Only if the court determines that

4  Plaintiff's Fourth Amendment rights were violated will the court address the immunity issue.

5  *Johnson*, 340 F.3d at 794-95; *Saucier*, 533 U.S. at 201, 121 S.Ct. 2151.

6       i.     *Tina's Claims*

7       Tina alleges that she was unlawfully seized in violation of the Fourth Amendment when

8  she was given a ticket by Underhill in the HHS parking lot for failing to register her vehicle.  The

9  court notes that there are no allegations that the car was in fact properly registered, or that

10  Underhill did not have the authority to issue a ticket for an improperly registered vehicle.  As

11  such, to the extent that Underhill detained Tina for the purposes of issuing the ticket, there are no

12  facts which can be proven which would demonstrate a violation of Tina's rights.  *See Whren v.*

13  *United States*, 517 U.S. 806, 813 (1996) (holding that reasonableness of traffic stops does not

14  depend of the actual motivations of the individual officer so long as probable cause exists for the

15  stop).  This conclusion passes only on the specific detention of Tina.  The related detention of

16  Omar prior to Tina arriving will be dealt with by the court shortly.  In addition, as no violation of

17  Tina's rights is found by this action, there can be no liability on behalf of Underhill's supervisors

18  based on a perceived custom or policy creating a violation of Tina's civil rights.

19       The other action giving rise to a section 1983 claim by Tina against the individual

20  defendants is the school administrators' failure to move forward on her complaints of

21  discrimination in violation of the Fourteenth Amendment.  There are no allegations in the

22  complaint that the failure to proceed on Tina's complaints by the individual defendants was

23  based on Tina's race.  *Cf. Monteiro v. Tempe Union High Sch. Dist.*, 158 F.3d 1022, 1032 (9th

24  Cir. 1998) (dismissing claim based on school assigning books with objectionable racist language

25  while noting that allegations of racism in the school would be actionable).  While there are

26  allegations that a custom of failing to investigate claims within the administration led to the

27  lawless arrests, the underlying section 1983 claim cannot be based on *respondeat superior*, but

28  instead must be based on individual actions of the defendants that lead to a constitutional

1   deprivation of Tina's rights.  *Graves v. City of Coeur D'Alene*, 339 F.3d 828, 848 (9th Cir.

2   2003).  The failure to plead refusal to act based on race as opposed to discretionary

3   determinations of the validity of the complaint is fatal as even in the light most favorable to

4   Plaintiff there are no facts which would suggest her individual rights were violated by the

5   individual defendants.  Accordingly, further analysis under qualified immunity need not be

6   undertaken.

7           *ii.      Chanae's Claim*

8           Chanae has only one claim surviving under section 1983, the complaint that she was

9   improperly arrested by Underhill as she passed by a fight on the HHS campus in violation of her

10  Fourth Amendment rights.  The court has reviewed the facts and, taken in the light most

11  favorable to Chanae, they show that she was detained purely because she was a known

12  troublemaker in the vicinity of an on-campus fight.  Being arrested purely on the basis of

13  reputation and proximity to a crime is a violation of Chanae's well settled Fourth Amendment

14  rights and can in no way be construed in a manner that would allow a reasonable officer to

15  believe his actions lawful.  *See, e.g., Mendocino Envtl. Ctr. v. Mendocino County*, 192 F.3d

16  1283, 1295 (9th Cir. 1999) (noting that information about a group's reputation is legally

17  insufficient to support probable cause that a member of that group is involved in criminal

18  activities); *see also Kaupp v. Texas*, 538 U.S. 626, 630-32 (2003) (holding that involuntary

19  transportation of a minor to the police station must be supported by probable cause).  Thus,

20  Chanae's section 1983 claim against Underhill is not precluded by the doctrine of qualified

21  immunity at this time.  Should more facts come to light in discovery, the court will again

22  consider the question of qualified immunity on this issue.

23          In addition, since there is the possibility of an underlying violation of Chanae's rights, the

24  court must also consider the possibility that a custom or policy enacted by the remaining

25  defendants led to the violation of Chanae's rights.  Supervisors "can be held liable under section

26  1983 'only if they play an affirmative part in the alleged deprivation of constitutional rights.'"

27  *Graves*, 339 F.3d at 848 (quoting *Rise v. Oregon*, 59 F.3d 1556, 1563 (9th Cir. 1995)).

28  "Supervisory liability is imposed against a supervisory official in his individual capacity for his

12

1   own culpable action or inaction in the training, supervision, or control of his subordinates; for his

2   acquiescence in the constitutional deprivations of which the complaint is made; or for conduct

3   that showed a reckless or callous indifference to the rights of others." *Larez v. City of Los*

4   *Angeles*, 946 F.2d 630, 646 (9th Cir. 1991) (internal quotations and citations omitted).  Chanae

5   has provided allegations sufficient to conclude that such a custom or policy may exist.  Since the

6   court is restrained to the pleadings at this stage, it cannot determine whether qualified immunity

7   may still exist on such a claim.  Thus, the court must defer deciding this qualified immunity issue

8   until the summary judgment stage, if it is raised again.

9       iii.    *Omar's Claims*

10      Omar brings his section 1983 claims on the ground that he was unlawfully detained twice

11  by Underhill.  The first incident occurred on November 16, 2004, when he and Ashley Ball were

12  left unattended in Tina's unregistered vehicle on the HHS campus.  The second incident occurred

13  on November 23, 2004, when Omar was left unattended on campus by Tina and was asked for

14  identification by Underhill.  The facts presented by Plaintiffs do not demonstrate that either

15  detention suffered by Omar was anything greater than an investigatory stop based on the

16  reasonable suspicion that he did not belong, as allowed by *Terry v. Ohio*, 392 U.S. 1 (1968).

17  When the court considers the lower expectations of privacy one must have when on a public

18  school's campus, *New Jersey v. T.L.O.*, 469 U.S. 325, 339 (1985), and the logical conclusion that

19  a non-student visitor must also lower their expectations of privacy, *United States v. Aguilera*, 287

20  F. Supp. 2d 1204, 1209 (E.D. Cal. 2003), it becomes apparent that Omar's Fourth Amendment

21  rights were not violated when he was stopped and asked for identification and the purpose of his

22  presence.

23      Omar has also raised a claim that Underhill's supervisors are also responsible for the

24  Fourth Amendment violation he claims to have suffered.  As noted when discussing Tina's

25  claim, since Omar suffered no Fourth Amendment violation at the hands of Underhill he cannot

26  show that Kallay, Mieras and Sayer created a custom or policy that led to the violation of his civil

27  rights.

28  ///

13

**B.  State Law Claims**

In addition to the federal claims discussed above, Plaintiffs also bring state law claims alleging battery, false imprisonment, intentional infliction of emotional distress, negligent infliction of emotional distress, negligent supervision and training, and violation of administrative regulations.

Defendants argue they are entitled to immunity on these claims pursuant to Nevada Revised Statute section 41.032.  Specifically, Defendants argue the actions of all Defendants were discretionary acts that cannot form the basis for a lawsuit in Nevada.

> Section 41.032(2) of the Nevada Revised Statutes provides as follows:
> no action may be brought under NRS 41.031 or against an immune contractor or an officer or employee of the State or any of its agencies or political subdivisions which is: [b]ased upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of the State or any of its agencies or political subdivisions or of any officer, employee or immune contractor or any of these, whether or not the discretion involved is abused.

Nev. Rev. Stat. § 41.032.  "Discretionary acts are those which require the exercise of personal deliberation, decision and judgment." *Travelers Hotel, Ltd. v. City of Reno*, 741 P.2d 1353, 1354 (Nev. 1987) (citing *Parker v. Mineral County*, 729 P.2d 491, 493 (Nev. 1986)).  An action can be brought, however, if the acts in question are merely "'ministerial,' amounting only to obedience to orders, or the performance of a duty in which the officer is left no choice of his own." *Maturi v. Las Vegas Metro. Police Dep't*, 871 P.2d 932, 934 (Nev. 1994).

*1.  State Claims Arising Directly From Arrest*

The Nevada Supreme Court has specifically concluded that a police officer's decision to make a traffic stop and arrest a person for failing to sign a traffic ticket are discretionary acts because they require the officer to use his judgment. *Ortega v. Reyna*, 953 P.2d 18, 23 (Nev. 1998).  In the present case, Underhill used his discretion to determine when to detain Plaintiffs and how to treat them once detained. *See Maturi v. Las Vegas Metro. Police Dep't*, 871 P.2d 932, 933 (Nev. 1994) (holding officer's decision to handcuff suspect behind back instead of in front despite complaints of medical problems was discretionary).  Accordingly, all state law claims arising directly out of Plaintiffs' detention by Underhill are dismissed under Nevada's state immunity law.  These claims are battery, false imprisonment, intentional infliction of

14

1    emotional distress and negligent infliction of emotional distress.

2        *2. Negligent Supervision and Training*

3        This court has held that the supervision and training of employees is not a discretionary

4    act subject to immunity under Nevada Revised Statute 41.032. *Herrera v. Las Vegas Metro.*

5    *Police Dep't.*, 298 F.Supp.2d 1043, 1054-55 (D. Nev. 2004). In addition, viewing the complaint

6    in the light most favorable to Plaintiffs, the court cannot say that a claim for negligent

7    supervision and training has not been stated. Plaintiffs have alleged that previous incidents

8    occurred which demonstrated to Defendants that they were negligent in their supervision or

9    training of Underwood. As such, Plaintiffs have pled the minimal requirements of the tort. *See*

10   *Hall v. SSF, Inc.*, 930 P.2d 94, 99 (Nev. 1996) (noting that an "employer has a duty to use

11   reasonable care in the training, supervision, and retention of his or her employees to make sure

12   that the employees are fit for their position").

13       *3. Violation of Administrative Regulations*

14       Plaintiffs bring this claim pursuant to WCSD Administrative Regulation 5144.21. The

15   WCSD Administrative Regulations do not provide an explicit private right of action for

16   violations of their requirements. However, in certain circumstances courts will imply a private

17   right of action into a statutory scheme. *See Cort v. Ash*, 422 U.S. 66, 78 (1975) (noting the four

18   factors to consider when determining whether a private right of action should be implied are (1)

19   whether the plaintiff was one of the class for whose special benefit the statute was enacted; (2)

20   whether there was an indication of legislative intent to create or deny such a remedy; (3) whether

21   the remedy was consistent with the underlying purposes of the legislative theme; and (4) whether

22   the cause of action was one traditionally relegated to state law so that it would be inappropriate to

23   infer a cause of action based solely on federal law)[8]; *see also Sports Form, Inc. v. LeRoy's Horse*

24   _____

25       [8] Some courts consider the *Cort* four factor test to be implicitly overruled and reduced to
     a single factor test seeking to determine the congressional intent behind a statute. *See Parry v.*
26   *Mohawk Motors of Mich., Inc.*, 236 F.3d 299, 308 (6th Cir. 2000). However, the Ninth Circuit -
     although recognizing the potential conflict between *Cort* and subsequent Supreme Court cases -
27   and the Nevada Supreme Court still consider the full four factor test relevant to determining if a
     private right of action exists. *See First Pac. Bancorp, Inc. v. Helfer*, 224 F.3d 1117, 1121-22
28

1  & *Sports Place*, 823 P.2d 901, 902 (Nev. 1992) (noting the factors in *Cort* are helpful for

2  determining private right of actions in state statutes as well).

3       In this matter Plaintiffs are part of the class for which the regulations were created.

4  However, it is clear that the regulations do not contemplate a private cause of action for damages

5  arising out of a failure to follow the regulations and that such a remedy would be inconsistent

6  with the goal of the regulations; namely encouraging the school district and its students to work

7  together and within the system to resolve disputes based on perceived discrimination.[9]  In fact,

8  the regulations provide an alternative avenue to the court system, without foreclosing that option,

9  by which an aggrieved may attempt to resolve grievance disputes.  In essence, the school district

10  gives individuals the ability to resolve their problems internally if they wish, without mandating

11  that they give up their legal rights.  When weighed in this light, the relevant factors discussed in

12  *Cort* do not imply a private right of action in the WCSD Administrative Regulations that would

13  allow an aggrieved student to sue the WCSD based on a violation of those regulations.

14  Accordingly, Plaintiffs' claim for relief must be dismissed.

15       IT IS THEREFORE ORDERED that Defendants' Motion to Dismiss (# 21) is hereby

16  GRANTED in part and DENIED in part as discussed in this order.

17       DATED this 16th day of February, 2006.

18

19

20  _____

21  LARRY R. HICKS
    United States District Judge

22

23  (9th Cir. 2000).  Thus, the four factor test is the appropriate test for determining whether a

24  private right of action exists in an action governed by Nevada state law.

25    [9]  The regulation provides a brief note on its purpose and scope, stating: "The best

26  solutions are those that involve input from those closest to the concern. . . . At any time, a student
    may choose to initiate the following grievance procedure along with having the legal right to file

27  a grievance with . . . a court of competent jurisdiction. . . ."  WCSD Reg. 5144.21 at 3.  Thus, the
    grievance procedure is designed as an alternative to litigation in the courts with the purpose of

28  using those closest to the situation to work out an amicable solution outside of the court system.

16